WALLACE SMITH v. THE STATE.

No. 6122. Decided April 20, 1921.

Rehearing denied June 24, 1921.

</div>

1.—Murder—Evidence—Declarations of Deceased—Declarations of Defendant and Third Parties.

　　Where defendant complained that the court did not permit him to introduce testimony as to conversations between defendant and a third party, but the record showed, on appeal that this testimony was introduced thereafter, there was no reversible error.

2.—Same—Evidence—Bill of Exceptions—Practice on Appeal.

　　Where the bill of exceptions did not contain the answers to certain questions to the witness, it cannot be considered on appeal.

3.—Same—Evidence—Bill of Exceptions—Rule Stated.

　　Where defendant objected in not being permitted to introduce testimony as to certain declarations by deceased, but the bill did not show the pertinency of the testimony and did not point out in itself error on part of the trial court, the same cannot be considered on appeal. Following Mauney v. State, 85 Texas Crim. Rep., 184, and other cases. However, the record showed that this testimony was admitted.

4.—Same—Evidence—Threats by Deceased—Bill of Exceptions.

　　Where defendant complained that he was not permitted to show threats by the deceased, but the bill of exceptions did not show why said testimony was admissible, and the record showed that this same testimony was admitted by other witnesses, there was no reversible error.

5.—Same—Evidence.

Where the State objected to testimony offering to go into detail as to the preparation defendant and his wife had made in expectation of the birt.ι of a baby, but the record showed on appeal that the State did not object to testimony that preparations had been made, and the bill was incomplete in showing the materiality of the testimony, the same cannot be considered on appeal.

6.—Same—Evidence—Declarations of Defendant—Motive—Credibility of Witness.

Upon trial of murder, where defendant was charged with killing his mother-in-law, there was no error in admitting testimony that the defendant charged his wife with improper conduct with other men with the encouragement of the deceased, and also the cruel treatment to his wife, to which deceased objected, and which led to the killing.

7.—Same—Evidence—Motive of Defendant—Acts of Deceased—Rebuttal.

Where, upon trial of murder, defendant introduced testimony that the relations between him and his wife were more than ordinarily pleasant, etc., and that deceased attempted to disrupt his family relations and for no cause induced defendant's wife to leave him, there was no error in permitting the State to show that deceased in the advising and bringing about a separation between defendant and his wife, was on account of his unwarranted cruelty toward his wife, and that defendant acted with malice in killing her. Following Eads v. State, 76 Texas Crim. Rep., 647, and other cases. The defendant having failed to introduce his wife as a witness.

8.—Same—Evidence—Rebuttal Testimony.

Where, upon trial of murder, the defendant testified that his wife received bruises on her foot by being caught in closing the door of an automobile, there was no error in permitting the State to show that such bruises were on the wife's foot several days before the killing, etc.

9.—Same—Evidence—Rebuttal Testimony—Acts of Defendant.

Where the defendant's testimony disclosed that his wife collapsed after the killing of her mother from excitement, and was taken to a hospital, there was no error in permitting the State in rebuttal to show that the nurse in the hospital observed bruises on said wife's body, and which tended to show that these were inflicted by the defendant.

10.—Same—Evidence—Bill of Exceptions—Contradicting Witness.

Where the bill of exceptions, as qualified, showed that the testimony objected to by defendant was admitted for the purpose of impeaching his brother's testimony, who swore that a State's witness had refused to accept an apology from the defendant, and, as a circumstance, to prove that said brother did not tell defendant that said State's witness had refused to accept defendant's apology, there was no error. Following Proctor v. State, 54 Texas Crim. Rep., 259, and other cases.

11.—Same—Evidence—Clothes of Deceased—Contradicting Witness.

Where, upon trial of murder, the defendant claimed that the deceased was shot accidentally in a struggle between him and the deceased to secure a pistol, and there was testimony by the State that deceased was shot in the back, there was no error in permitting the State to show that the apron worn by deceased had powder burns upon it, at a point which, if on the body of the deceased, would be about the left shoulder, etc.; defendant contending that deceased was not shot in the back.

**12.—Same—Jury and Jury Law—Practice in Trial Court.**

Upon trial of murder, there was no error in permitting the jury, upon their request to take in their retirement the pistol with which the shooting had been done, and which had been introduced in evidence for their examination, in their deliberations upon the case; it not having been shown that the jury made any improper use of the same. Following Bell v. State, 32 Texas Crim. Rep., 436, and other cases.

**13.—Same—Argument of Counsel—Husband and Wife—Acts of Third Party.**

Where, upon trial of murder, the defendant was charged with killing his mother-in-law, growing out of cruel treatment of his wife to which deceased objected, and the State claimed malice on the part of the defendant, and the defendant did not introduce his wife as a witness, State's counsel alluding to this failure and commenting unfavorably thereon, the fact that during the argument defendant's wife came into the court-room and remained there in the presence of the jury, was not reversible error.

**14.—Same—Argument of Counsel—Husband and Wife.**

Where defendant complained that State's counsel abused his right to comment on the failure of defendant to use his wife as a witness, but the testimony showed that counsel for the State did not abuse said privilege under the facts in the instant case, there was no reversible error.

**15.—Same—Prosecuting Officers—Comments of Court.**

See opinion for favorable comments by this court wherein the District Attorney filed an able brief for the State in aid of the Assistant Attorney General, for the State and the court.

**16.—Same—Rehearing—Argument of Counsel—Language Used.**

Where the record showed on appeal, testimony by the State that the defendant killed his mother-in-law with malice because the latter had objected to his cruel treatment of his wife, and had caused the separation between them, and also showed the failure of defendant to introduce his wife as a witness, there was no reversible error in the argument of State's counsel to the effect that if he had done so she could and would tell how her mother was murdered by the defendant, as this was a statement of fact rather than an inference from the evidence before the jury; although better language might have been selected for that purpose.

Appeal from the Criminal District Court of Tarrant. Tried below before the Honorable Geo. E. Hosey.

Appeal from a conviction of murder; penalty, thirty-five years' imprisonment in the penitentiary.

The opinion states the case.

*McLean, Scott & McLean,* for appellant.—On question of impeaching defendant's testimony: Drake v. State, 29 Texas Crim. App., 265; Jennings v. State, 60 Texas Crim. Rep., 422; Davis v. State, 155 S. W. Rep., 550; Sapp v. State, 190 id., 489.

On question of permitting jury to take pistol in their retirement: Williams v. State, 35 Texas Crim. Rep., 183; Lockett v. State, 55 S. W. Rep., 336; Kiser v. State, 13 Texas Crim. App., 204.

*C. M. Cureton,* Attorney General, *Walace Hawkins,* Assistant Attorney General, and *Tom L. Beauchamp,* Assistant Attorney General,

for the State.—On question of appearance of defendant's wife in court room: Black v. State, 143 S. W. Rep., 934; Yates v. State, 152 id., 1064; Bybee v. State, 168 id., 527; Fondren v. State, 169 id., 416; Gomez v. State, 170 id., 713.

HAWKINS, JUDGE.—The appellant was convicted of murder, and his punishment assessed at confinement in the penitentiary for a term of thirty-five years.

The record shows that appellant was a practicing physician in the city of Fort Worth, and had been married about two years. His wife was the daughter of the deceased, Mrs. Ruby White. During most of the time they had been married they had lived at 2137 Jennings Avenue in the City of Fort Worth, but about two weeks before the homicide appellant and his wife bought and moved to a place on Richmond Avenue in said city. The wife of appellant was pregnant at the time of the homicide, and gave birth to a child about a month thereafter. The facts further show there was a disagreement between deceased and appellant, and that the trouble came up over the wife of appellant.

It was appellant's theory, and he introduced numerous witnesses who sustained it, that there had never been any trouble between him and his wife, but that they were usually affectionate and devoted to each other, and that all the trouble between the appellant and the deceased had been caused by wrongful acts and conduct of deceased; that she wanted appellant's wife to become a moving picture actress, and had objected to her marrying in the first place, and wanted her to leave appellant so that she might yet become a "movie star;" that she repeatedly cursed and abused appellant while talking to him over the phone and about him to other parties; that on the day of the homicide she had succeeded in getting appellant's wife to leave her own home and go to the home of deceased, and that appellant followed her there for the purpose of persuading her to return home; that he had succeeded in doing so, and when deceased ascertained that fact she interfered and assaulted appellant; that appellant's gun fell out of the waist of his trousers into his lap, whereupon deceased seized the barrel and appellant seized the handle, and in the struggle for the possession of the gun it was discharged and deceased was killed. Appellant swore that he had no intention of killing deceased; that he struggled for possession of the gun as a matter of self-defense, feeling that if deceased got possession of it she would kill him. The pistol was fired five times. Appellant swore that he and deceased were facing each other all the time the gun was firing, that they each had hold of the gun all of the time it was firing and that he never had any intent other than to protect himself, and that he did not fire the gun other than accidentally while struggling for its possession. He swore positively that he did not shoot deceased in the back, that she was facing him all the time and was not shot in the back; he introduced much

evidence as to the conduct of deceased towards him and his wife, show-ing the efforts she had made to induce his wife to leave him, his theory being that, without fault on his part, she was attempting to break up his home.

It was the theory of the State throughout the case that there was a feeling of malice on the part of appellant towards deceased and had been for some time; that the immediate trouble between them was caused by the fact that appellant had been mistreating his wife, who was in an advanced pregnant condition, and that deceased had inter-fered .in an effort to protect her daughter, which interference had re-sulted in incurring the enmity of appellant; that by reason of this misconduct on the part of the appellant towards his wife she had decided to leave him on the morning of the homicide and return to her mother; that appellant and his wife had an understanding that morning about the separation, and that thereafter deceased was sent for, and went to the home of appellant and there talked with and ex-amined her daughter, and told appellant that if that was the best way he could treat her daughter in the condition in which she was, that she was going to take her home with her, and did so, that a short time thereafter appellant followed her home, and shot her, in the presence of his wife. It was also the theory of the State that the shooting was not accidental, but was done intentionally, and that deceased was, for the most part, shot in the back, thereby directly controverting appel-lant's statement of how the shooting took place.

We deem the foregoing a sufficient statement of the case, in con-nection with what may be said in the discussion of the legal questions raised upon the appeal.

In the first three bills of exceptions, appellant complains because the court did not permit him to prove by his brother, W. A. Smith, certain conversations between appellant and one Mrs. Wilson, which occurred at appellant's home on the morning of the day of the killing, and also as to Mrs. Wilson telephoning her husband, and what she said to him about appellant. This testimony must have been excluded at the beginning of the examination of the witness, because later he testified fully about all the matters to which the bills relate, as shown by reference to the statement of facts to which we are referred by the trial judge in the explanation to one of said bills. Therefore, no error appears.

Bills of exception Nos. 4 and 7 cannot be considered. They attempt to complain of the action of the court in not .permitting the witnesses, Mrs. Arnold and C. W. Davis, to answer certain questions, but fail to show what the answer would have been in either case. Authorities cited in Branch's Ann. P. C., p. 136.

While Mrs. Arnold was testifying, it appears from bill of exceptions No. 5, that appellant's counsel asked her if deceased ever made any statement to witness as to why deceased wanted her daughter to leave appellant. The court sustained objection to the question, and the bill

recites the witness would have answered that the reason given by deceased was "because she wanted her daughter to become a 'movie star;' that is, a moving picture actress." This is all there is to the bill. It nowhere undertakes to show how this testimony was pertinent to any issue in the case. It is not the duty, nor does the law require, this court to search through the record in order to determine whether or not a matter complained of in an insufficient bill presents error. The bill must within itself show error on the part of the trial court. It must sufficiently set out the proceedings and attendant circumstances, to enable this court to know certainly that an error was committed. Thompson v. State, 29 Texas Crim. App., 208; Spencer v. State, 61 Texas Crim. Rep., 62; Oliver v. State, 65 Texas Crim. Rep., 150, 144 S. W. Rep., 604; Baker v. State, 67 Texas Crim. Rep., 476, 145 S. W. Rep., 607; Mauney v. State, 85 Texas Crim. Rep., 184. Ordinarily the statement of facts will not be looked to in aid of a defective bill, unless the trial court refers to it in his explanation. See many cases cited in Branch's Ann. P. C., p. 137, Sec. 213. But if we do look to the statement of facts, we find many witnesses testified that deceased wanted appellant's wife to leave him to become a moving picture actress. The bill as prepared shows no error; and we find the same testimony went into the record from other sources.

The same witness was asked if she ever heard deceased make any "threats relative to whether or not she had attempted or would attempt to take the life of appellant," to which she replied, "Well, at one time when she was talking of him she says she started to kill him once, and she wished to God she had." This answer was objected to by the State, and withdrawn by the court. The bill is absolutely silent as to why said testimony was admissible, and the foregoing is substantially all the bill shows. What has been said of bill No. 5 is entirely applicable to this one. It presents no error. But the statement of facts shows practically this same testimony went into the record from three other witnesses.

Appellant offered to testify as to the preparation he and his wife had made in expectation of the birth of the baby, in the way of clothing, baby carriages, etc., to show the condition of appellant's mind when deceased told him his wife could not go back to him. The State objected to him going into details, but did not object to him stating that preparations had been made; whereupon the counsel stated that "they wanted it all or none." The objection was sustained, and bill of exceptions taken. The foregoing states all the bill contains. It does not disclose what the appellant would have testified. The bill is incomplete, and cannot be considered for the same reasons given with reference to bills Nos. 4 and 7.

Appellant was asked on cross-examination, if he was not in the habit, when living at 2137 Jennings Avenue, of running over to his neighbor's, Mrs. Murray, and charging his wife with receiving the company of men, and deceased with encouraging his wife in doing so;

and if he did not ask Mrs. Murray who the men were who had been visiting his wife. He was also asked if he did not fire his pistol off in his room at night for the purpose of intimidating his wife, and if he did not, a few days before the killing, have his wife in a car, and drive carelessly and recklessly over a rough road to Mrs. Stark's; and was asked about his conduct and language there, relative to his wife. Appellant denied all matters which would indicate cruel treatment to his wife. Bills were reserved to all these questions. The State then, in rebuttal, proved by Mrs. Murray that she was a near neighbor of appellant and his wife when they lived on Jennings Avenue, and that she had heard shooting in his house in the night-time; and upon inquiry of appellant as to why he was shooting and what he was shooting at, appellant would tell her "sometimes it was cats and sometimes it was rats;" that she had counted ten bullet holes in the house, five of them in the ceiling of the bed room, three in the partition wall between the bed room and the dining room, one in the door between the bed room and the sitting room, and another in a closet door of the bed-room. This witness further testified that on several occasions the appellant would drive hurriedly up to her house, come in and ask "if I had seen anybody calling at his house," and said that "people had 'phoned him and told him that she was receiving male company there." "He told me that his wife was entertaining, and that the deceased was upholding her in it;" that this conduct on the part of appellant continued for a period of about a month, and that his last inquiry of this character was about two weeks before the killing. This witness testified that upon more than one occasion after appellant left she would go over and tell his wife about appellant's conduct, and his inquiries; and that upon one occasion the deceased was present at the time this information was conveyed to Mrs. Smith.

The State also proved by Mrs. E. A. Trimm that she lived near Mrs. Stark, a sister of appellant's wife, and that a few days before the killing appellant drove his car rapidly up to Mrs. Stark's house, and came very near turning his car over, it appearing from other testimony in the case that the road to the Stark residence was rough,—being cut up with gulleys and ditches after leaving the Cardinal road. The State also proved by Mrs. Stark that upon this same occasion the appellant left his wife at her home, and when he came back for her the witness told him that his wife was suffering and was not able to go home; and he replied, "She is my wife, and she is damn sure going home." That the witness told appellant that he and his wife were both welcome to spend the night at their home, but that he declared "She is my wife, and I will take her home, and it is none of your God-damn business." During this conversation about taking his wife back home, it appears that appellant went from the house to his car on several occasions, and asked his brother, who was waiting in the car, to let him have his gun, but that he did not procure it.

All of this testimony was objected to by appellant, and proper bills reserved. The questions asked appellant on cross-examination with

reference to these same matters, and the complaint on account of the court permitting the witnesses to testify to these facts upon rebuttal. are presented in bills of exception Nos. 9, 10, 11, 12, 16, 17, 18 and 20, and will all be considered together, as they relate to the same subject-matter.

Before discussing this subject, it will be well to recall the method of developing this case on the trial. The State, in making out its case, used only four witnesses, contenting itself with proving the fact of the killing, and in no way adverted to the relations between appellant and his wife. As soon as the State rested, appellant commenced an attack upon the deceased. He introduced many witnesses to show that the relations between him and his wife were more than ordinarily pleasant, and the affection between them was unusual. He showed by many witnesses that deceased, without any cause on his part, had objected to her daughter marrying, and was constantly attempting to disrupt the family relations, and induce appellant's wife to leave him, for the sole reason that his mother-in-law was ambitious for her daughter to become a moving picture actress.· The State's theory was that any act on deceased's part advising or wishing to bring about a separation,. was on account of appellant's unwarranted cruelty towards his wife, which naturally incensed her mother, and that her rightful interference was the motive for the killing, and showed malice on appellant's part in the act. How was the State to prove cruelty of accused toward his wife? She could not be placed upon the witness stand, except by him, which he declined to do. Her mother's lips had been forever closed by the act of appellant. Under such circumstances is the State to sit helpless? Or may it not resort to the proof of every legitimate circumstance which will sustain its theory and combat, or tend to combat, that of accused. Cameron v. State, 69 Texas Crim. Rep., 439, 153 S. W. Rep., 868. In Eads case, 76 Texas Crim. Rep., 647, 176 S. W. Rep., 574, the defendant had killed his father-in-law, giving as his reason that· he had caught deceased in an act of incestuous carnal intercourse with his daughter, the wife of defendant. This court says:

"The State could offer any legitimate testimony at its command to rebut such testimony. The law closed the mouth of his wife, unless he elected to call her as a witness, and this he did not do. Appellant, in killing his wife's father, had closed his mouth, and it seems that appellant placed the transaction at such a time and place that no other witness could have seen the transaction, and the only testimony at the command of the State to rebut this testimony, was the reputation of his wife for virtue and chastity," and held the admission of such evidence not error. The doctrine announced in the Eads case seems to be singularly applicable here. Some of the testimony offered by the State was of a circumstantial nature, but does that render it inadmissible? In Wharton's Criminal Evidence, 10th Ed., Vol. 2, p. 1682, the following is found:

"When proof has been made of the *corpus delicti* in a homicide prosecution, all facts and circumstances that tend to show motive on

the part of the accused are relevant, and equally relevant are the relations between the accused and the deceased, and all feeling that existed between them.   The application of this rule is not limited by the remoteness of such circumstances, as that goes only to the weight, and not to the relevancy.   There is no rule by which remoteness that may affect the relevancy of such evidence may be established, but this must be determined from the circumstances of each case.   However, motive cannot be established through facts and circumstances of which the accused himself had no knowledge; but this again is limited by the fact that actual knowledge need not be shown where it appears that there was opportunity to be informed, or that a rumor concerning the same existed in the vicinity where the accused and the deceased were neighbors."

In support of that text he cites the following Texas cases: Villereal v. State, 61 S. W. Rep., 715; Weaver v. State, 43 Texas Crim. Rep., 340; Weaver v. State, 46 Texas Crim. Rep., 607; Baines v. State, 43 Texas Crim. Rep., 490; Barkman v. State, 41 Texas Crim. Rep., 105; Lancaster v. State, 31 S. W. Rep., 515; Gay v. State, 40 Texas Crim. Rep., 242; Neely v. State, 56 S. W. Rep., 625; Honeycutt v. State, 63 S. W. Rep., 639; Long v. State, 48 Texas Crim. Rep., 175; Morrison v. State, 37 Texas Crim. Rep., 601; Wilkerson v. State, 31 Texas Crim. Rep., 86.

In the instant case the testimony was admissible, not only on the question of motive, but on the direct issue joined between appellant and the State as to his conduct towards, and his treatment of, his wife.   The manner of driving his car in the condition his wife was then in, may be a circumstance of small weight, but does not affect its admissibility; if it reflects a careless disregard for his wife's welfare, it would be for the jury to consider, along with all other facts in evidence on that issue.   That appellant's conduct at Mrs. Stark's on the occasion inquired about, was most unusual, is borne out by the statement of appellant's brother, who says: "Mrs. Stark seemed to think the doctor (appellant) was drunk, and asked me if he was."   Under the circumstances of this case, we are of opinion all this testimony was admissible.   It follows that the State was within her rights when the questions in regard to the same matters were asked appellant.

While Mrs. Stark was testifying she told of having seen a bruise on appellant's wife's foot, when they were at her house a few days before the killing.   Accused excepted to this, as shown in his bill No. 19.   It presents no error.   Appellant had already testified about the bruised foot, explaining that it was caused by being caught in closing the door of the automobile.

After the killing, appellant's wife collapsed from the excitement, and was taken to the hospital.   The State in rebuttal offered one of the nurses, who testified over objection that she observed bruises on the wife's body: "bruises on both her forearms, above the elbow; they were finger prints, black places on both her arms; and a bruise on her

right side just in front of her hip, as big as your two hands and very purple." Appellant objected because there was no evidence that he had caused the bruises, and that it was .highly prejudicial. It may have been prejudicial in the sense that it was hurtful to appellant, but that would not render it inadmissible, if legitimate evidence. There is evidence in the record which tends to show that these bruises were caused by appellant. Mrs. Wilson testified that on the morning of the day of the killing, she went with deceased to the home of appellant, and that his wife was showing her mother her arms while they were both sitting on the bed; that deceased was looking at her daughter, and that witness heard deceased tell appellant—"if that is the best he could do that in such condition she was going to take her daughter home." Here was a direct accusation against appellant, charging him with having caused the bruised condition of his wife, before which he stood mute, and the reason why deceased was going to and, according to the State's theory, did, take her daughter home only a few hours before the killing. We find no error in the admission of the testimony complained of, for the same reasons heretofore stated in discussing other bills.

While Mrs. Wilson and deceased were at appellant's house on the morning preceding the killing, he came in, and seems to have resented the presence of a third party as a witness to a family disturbance, and, although she was there at Mrs. White's (deceased) invitation, he requested her to leave; she became incensed either at .the request or the manner of it, and 'phoned her husband, J. A. Wilson, that appellant had insulted her. W. A. Smith, appellant's brother, went to Wilson and explained what had occurred, and no insult had been intended. He admits on cross-examination that perhaps Wilson did tell him his wife had no business over there anyway, but says he did not tell appellant that; but told him Wilson was mad, and had not accepted his apology. Wilson and his wife lived at the same house where deceased lived; and appellant offered this evidence as explanatory of why he carried his pistol with him when he went after his wife; that he feared trouble with Wilson. The State proved by Wilson that he did accept the apology, and told W. A. Smith it was all right, and that W. A. Smith said he would tell appellant. Objection was urged to Wilson's testimony. The court's qualification shows: "Said testimony was admitted for the purpose of impeaching witness Smith, who swore Wilson refused to accept an apology, and as a circumstance to prove that witness Smith did not tell defendant that Wilson refused to accept apology." This testimony was clearly admissible. Proctor v. State, 54 Texas Crim. Rep., 259; Long v. State, 59 Texas Crim. Rep., 103, 127 S. W. Rep., 554.

The State proved by the witnesses Eagle and Clark that the apron worn by deceased had powder burns on the back of it, at a point which, if on the body, would be about the left shoulder. Appellant's counsel objected to this evidence because it was not the best evidence (bills of exception Nos. 13 and 14), and then when the State offered the apron,

objected to it because of bloodstains on it. (Bill No. 22.) Appellant had testified that he and deceased were facing each other all the time the pistol was being fired; that she was endeavoring to secure the pistol, and had hold of the barrel while he was holding the handle; that she was holding the gun all the time, and that the firing was accidental. The testimony showed that deceased was shot twice in the back; the witness Eagle had taken the apron off the body of deceased after her death, and knew which was the front and back as worn by deceased, and testified the powder burn was in the back of the apron about where the left shoulder of deceased would fit in the apron. Appellant was contending that he did not shoot deceased in the back. The testimony as to location of the powder burns, and the apron itself showing the location of the powder burns, were all admissible upon this disputed point. The court qualifies the bill as to the apron, by stating that "it was wrapped in paper, and opened for the purpose of identification by witnesses testifying to powder burns. The court did not permit the apron to be displayed so that it could have been seen by the jury, and counsel for neither side ever requested that it be displayed before the jury at any time." The qualification removed any possible harm which might have come to appellant from the introduction of the apron. The court was more cautious perhaps than the circumstances of the case would warrant. If the apron disclosed the powder burns in the back, and its inspection would have aided the jury in solving a disputed question as to whether deceased was shot from the front or rear, it was admissible, blood or no blood. In Branch's Ann. P. C., Vol. 2, p. 1083, the general rule is stated to be:

"It is permissible to introduce bloody clothing in evidence only when the introduction serves to illustrate some point or solve some question, or serves to throw light upon the matter connected with the proper solution of the case, and under no other circumstances; but whenever the introduction of such clothing would in the light of the whole case, aid the jury in arriving at the very truth of the matter, the court should not hesitate to admit its production and exhibition," and citing some fifteen cases bearing out this rule.

After retirement the jury requested the pistol which had been introduced in evidence for their examination in their deliberations upon the case. Appellant objected to this as shown by his bill No. 23. The bill does not undertake to show that the pistol was used by the jury for an improper purpose, or that any additional fact was discovered by them upon its examination. Unless it is made to appear that the articles which are in evidence, and taken to the jury room, were used by the jury in any different manner than accorded with the testimony, or that some new fact hurtful to appellant was thereby discovered, the matter will not be revised on appeal. Such has been the holding of this court, even when the bloody clothing of deceased was properly in evidence, and taken by the jury to their room. Bell v. State, 32 Texas. Crim. Rep., 436; Spencer v. State, 34 Texas Crim. Rep., 238; Chalk.

v. State, 35 Texas Crim. Rep., 116; Grayson v. State, 40 Texas Crim. Rep., 573; Webb v. State, 69 Texas Crim. Rep., 413, 154 S. W. Rep., 1013.

It is made to appear by proper bill that during the argument of the case appellant's wife came into the courtroom and remained during the arguments, in the presence of the jury. The bill recites that she sat "right in front of the jury, by the side of the prosecuting officers." The qualification states that "she did not sit next to the prosecuting officers, but most of the time on a bench with two other ladies, and rather to the side of the jury than in front of them, while appellant and his kinsmen and kinswomen sat directly in front of the jury." We fail to see that where she sat was a material matter. We may infer from the bill that she was not during the argument with appellant and his relatives. She had a right to sit where she pleased, with them or aloof from them as her feelings dictated. The attorneys frequently alluded to the failure of appellant to use his wife as a witness; explaining that he could use her, but the state could not, and that she was the only eyewitness outside of appellant, and that she could tell how her mother was killed and murdered, but that appellant refused to put her on the stand, and kept her mouth closed.

Counsel for appellant recognizes in his brief the rule so well established that it is unnecessary to cite authorities, that State's counsel has the right to argue the failure of accused to use his wife as a witness, but insists the right in this case was abused. Appellant was unfortunately situated. He had killed his mother-in-law, and for some reason preferred not, or dared not, place her daughter, his wife, upon the witness stand. The State's theory was that this unhappy situation was brought about by appellant's own acts; and doubtless the arguments of State's counsel in referring to his fear of his wife's testimony was telling and harrowing; but if they had taken that as their text and confined their entire argument to it, as long as it was within the bounds of proper discussion, no error was committed. We think they were clearly within the limits of legitimate deductions in every thing stated by them as disclosed in the bill.

We have been very greatly aided in this case by the exhaustive brief for the State filed by Mr. Brown, the district attorney of Tarrant County. If all the prosecuting officers would adopt a similar practice it would be a great help to the Assistant Attorney General in the discharge of his duties, and would largely facilitate the labor of the court.

Finding no errors in the record, the judgment of the trial court is affirmed.

*Affirmed.*

ON REHEARING.

June 24, 1921.

MORROW, Presiding Judge.—The language used by the prosecuting attorney, in referring to appellant's wife, is thus stated in the bill: ". . . she and she alone, was the only eyewitness to the killing except the defendant, and that she could and would tell how the killing took place but that the State was powerless to put her on the witness stand as a witness, and that the defendant, and the defendant alone, could place her on the witness stand and let her testify. This he refuses to do but keeps her mouth closed and if she could only testify she would tell you how her mother was murdered by the defendant."

The fact that the State's attorneys called attention to appellant's failure to use his wife as a witness and to the fact that he alone could so do is not complained of, but the criticism is addressed to the language chosen and quoted above as transgressing the rule forbidding counsel in argument to state facts not in evidence; that the expressions: "She could and would tell" and "she would tell how her mother was murdered by the defendant" was a statement of fact rather than an inference from the evidence before the jury. Doubtless, more appropriate language might have been chosen. In the light of the record, that is, the testimony of the witnesses and the facts necessarily before the jury in the instant case, we are yet of the opinion that the argument furnishes no just ground for a reversal of the judgment.

Appellant's wife was a daughter of the deceased. There was evidence that before the homicide her relations with the appellant were unsatisfactory to a degree that a separation resulted. In a controversy growing out of it, the deceased, in the presence of her daughter, was killed by the appellant; that it was accidental was his theory; that it was intentional and malicious was the State's theory. All of this was before the jury, and in addition thereto, they knew that the appellant did not use his wife as a witness. They were legitimately told that he might have done so had he wished but that the State could not. They knew from the evidence that her situation was such as would enable her to relate what took place at the time of the homicide. These matters were the basis of legitimate argument. We cannot persuade ourselves that they would not suggest the inference that the appellant refrained from using his wife as a witness because of his knowledge that she was unfriendly would not give evidence supporting his theory. The language used by the prosecuting attorney, while not the best that might have been selected for that purpose, was adapted to press upon the jury's attention this legitimate inference.

The other matters referred to in the motion for rehearing, all of which were urged upon the original hearing, have been re-examined in the light of the motion. We are not able to bring our minds in accord

with the contention of appellant's counsel that a proper disposition of the questions raised was not made in the original opinion.

We therefore overrule the motion for rehearing.

*Overruled.*